**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Travelers Property Casualty Insurance Company,<br><br>              Plaintiff,<br><br>v.<br><br>Kenneth Gee, et al.,<br><br>              Defendants. | No. CV-23-00151-TUC-CKJ<br><br>**ORDER** |

For reasons explained below, the Court grants the Defendants' Motion for Summary Judgment and denies Plaintiff's Motion for Partial Summary Judgment.

On April 26, 2024, both parties filed dispositive motions addressing the same issue. *See e.g.,* (Plaintiff's Opposition to Defendants' Motion for Summary Judgment (P Resp. Ds MSJ) (Doc. 36) at 4 n. 1 (avoiding duplication of arguments by incorporation of dispositive motion arguments in Response to Defendants' dispositive motion). The better way for the parties to have briefed the issue would have been by crossmotions. The Plaintiff seeks oral argument. The Court concludes that oral argument is not necessary because the parties have had an adequate opportunity to provide the Court with evidence and legal memoranda supporting their respective positions. Oral argument would not significantly aid the decisional process. *See Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir.1998), *see also* LRCiv. 7.2(f) (the court may decide motions without oral argument).

On September 19, 2023, the parties filed a Joint Report pursuant to Fed. R. Civ. P. 26(f) for case management purposes. They described the "Nature of the Case" as arising

from a vehicle accident in which Defendant Sharon Gee (Wife), who was a passenger in a vehicle operated by Kenneth Gee (Husband), sustained injuries. At the time of the accident, the Defendants "were each insured pursuant to an automobile liability policy ("Policy")" issued by Plaintiff, Travelers, with a liability for bodily injury limit of $250,000, "subject to a step down sub-limit of $25,000 if the claimant is a "resident relative" defined to include spouses who reside together ('Step Down Provision')." (Joint Report (Doc. 8) at 1.) Plaintiff seeks "a declaration regarding coverage." *Id.* "Subsequent to filing the suit, the Parties reached an agreement to resolve the dispute via an adjudication as to whether the Step Down Provision is enforceable." *Id.* at 1-2 (citing Amended Answer, Ex. 1: Settlement Agreement (Doc. 6-1)). "Per the Agreement, Travelers will pay the Gees either $25,000 or $250,000, dependent on the enforceability of the Step Down Provision." *Id.*

The Joint Report described the elements of proof for each count as: "Per above, this suit solely involves the adjudication of the enforceability of the Step Down Provision. According to the parties, there are no facts in dispute "except the understanding of the Gees regarding the terms of the Policy when it was issued. The sole legal issue is the enforceability of the Step Down Provision." *Id.* at 2. The parties reported they were considering whether stipulated facts would permit the Court to adjudicate the enforceability of the Step Down Provision via motion. If not, the parties agreed to a court trial, "albeit with limited factual disputes and testimony." *Id.*

Defendants filed a Motion for Summary Judgment asking the Court to resolve the question of whether the step-down provision in the Policy was void under the reasonable expectation doctrine, (Defendants' Motion for Summary Judgment (D MSJ) (Doc. 28) at 9), and asking for a judgment for the Gees' in the amount of $250,000, (Defendants' Reply Supporting MSJ (D Reply) (Doc. 39) at 2.).

Plaintiff filed a Motion for Partial Summary Judgment and referenced on the very last page: "In this case, it bears pointing out that the policy included UIM (underinsured motorist) Coverage ($250,000) and that Wife made a claim for this coverage which Travelers paid. *See* Stipulation, Exhibit 1. In suing Husband, Wife is necessarily seeking

1    coverage under the Policy in multiple ways." (Plaintiff's Motion for Partial Summary

2    Judgment (P MPSJ (Doc. 30) at 12.) In its Response to Defendants' Motion for Summary

3    Judgment, Plaintiff made clear its position that regardless of the Court's disposition of the

4    Defendants' entitlement to coverage under the reasonable expectations doctrine,

5    Defendants were nevertheless precluded from stacking multiple coverage under the Policy.

6    (P Resp. Ds MSJ) (Doc. 36) at 15-16.) In other words, Defendants cannot recover under

7    the doctrine of reasonable expectations because the Policy includes an anti-stacking

8    provision.

9           Under Plaintiff's approach, disposition of what was once described as the "sole legal

10    issue" to be adjudicated by the Court, i.e., "the enforceability of the Step Down Provision,"

11    is moot if the Policy precludes stacking multiple coverages. It is undisputed that Wife has

12    recovered $250,000 under UIM provisions of the Policy, which according to Plaintiff is all

13    she is entitled to under the Policy. In other words, even if Defendants prevail on summary

14    judgment, they cannot obtain a judgment for $250,000 in liability coverage because they

15    have already been paid all they are owed under the Policy.

16           In Reply, Defendants express "outrage," (D Reply) (Doc. 39) at 2), and accuse

17    Plaintiff of attempting to void the Settlement Agreement, *id.,* entered into by the parties

18    subsequent to the filing of the case and the Amended Complaint. On July 5, 2023, the

19    parties entered into the Settlement Agreement, subsequently dismissed a state court action

20    filed by Wife against Husband for $250,000 in bodily injury liability coverage, and agreed

21    to resolve this coverage issue in this action. *Id.* The Settlement Agreement was attached to

22    the Amended Answer and relied on by the parties in the Rule 26(f) Joint Report, which

23    described the adjudication of the reasonable expectation doctrine as the "sole" legal issue

24    for adjudication in this case.

25           Plaintiff filed a motion seeking only partial summary judgment, without much

26    mention of the anti-stacking argument but presented it fully in Response to Defendants'

27    dispositive motion. Defendants addressed the question of "stacking" UIM coverage in the

28    Reply supporting their Motion for Summary Judgment. The matter has, therefore, been

briefed and the Court shall resolve it first. As noted above, the Court need not reach the question of whether the reasonable expectation doctrine applies to void the express step-down ($25,000) limitation in the Policy precluding Wife, as a "resident insured," from full liability coverage ($250,000) if Wife has in fact recovered all she is entitled to pursuant to Plaintiff's payout of $250,000 in UIM benefits to her.

A.    Stacking Multiple Coverages in the Policy.

The Plaintiff challenges Defendants' claim for full liability coverage ($250,000) for bodily injury because she received $250,000 in UIM benefits under the Policy and "stacking" is precluded under the Policy. The Plaintiff argues that the Policy is "comprised of multiple coverage parts, including a Liability Coverage Part and an Underinsured Coverage Part." (P Resp. Ds MSJ) (Doc. 36) at 15; Joint Statement of Facts (JSOS), Ex. 3: 2021-2022 Policy, Declarations (Doc. 32-8) at 9 (listing coverages: bodily injury, property damage, medical payments, uninsured motorists (UM) bodily injury, and underinsured motorists (UIM) bodily injury, collision, and comprehensive). Plaintiff relies on the "Liability Coverage Part," Provision C: "No one will be entitled to receive duplicate payments for the same elements of loss under this Coverage Section," and any other coverage section or part of this policy or any other personal auto policy issued by Plaintiff. *Cf.,* (JSOF, Ex. 2: 2019-2020 Policy, Liability Coverage Section (Doc. 32-4) at 4.) Plaintiff asserts: "Travelers previously paid Wife $250,000 in UIM benefits - the full limit of coverage available under the Policy. [] By making a claim against Husband, Wife is necessarily seeking duplicate payments for the same loss under both the Liability Coverage Part and an Underinsured Coverage Part." (P Resp. Ds MSJ) (Doc. 36) at 15.) In other words, Defendants' claim made here for bodily injury liability is impermissible stacking.

Plaintiff relies on *Taylor v. Travelers Indem. Co. of Am.*, 9 P.3d 1049 (Ariz. 2000), where like Defendants' case, the wife was riding in the family car driven by her husband and was injured due to his negligent operation of the car. The Taylors had a $300,000 single-limit liability policy issued by Travelers, with UIM coverage in the same amount. Wife recovered less than $300,000 because the liability coverage for bodily injury was

equally distributed between her and the four occupants of the other vehicle who were also injured. Travelers brought a declaratory judgment suit related to wife's claim for recovery of UIM benefits under the same policy. Ultimately, wife prevailed when the court disapproved *Preferred Risk Mutual Insurance Co. v. Tank*, 703 P.2d 580 (Ariz. App.1985) and held as a matter of first impression that a policy provision is invalid that eliminates UIM benefits for an insured injured in her own vehicle resulting from the negligence of another person insured under the same policy. *Taylor,* 9 P.3d at 1051. In *Taylor*, the court further held that such an insured is covered up to the face amount of the applicable UIM insurance, less any sums recovered under the liability coverage of the policy. *Id.* at 1059.

"[T]he purpose of UM and UIM coverage is to enable the consumer to protect himself and family members against the possibility that, in any given accident, there will be no or insufficient liability coverage to compensate for the actual damages sustained." *Taylor,* 9 P.3d at 1055. "An insured who purchased coverage against two separate risks, [i.e., bodily injury and underinsured tortfeasors,] each of which occurred, generally may recover under both coverages." *Id.*

In *Taylor,* the court distinguished between stacking concurrent coverages for a single loss and seeking to recover under more than one type of coverage for a given loss. The latter, which is sometimes described as "stacking," is more a question of the risks that fall within a particular type of coverage. Generally, insureds are allowed to receive recovery under more than one coverage "as long as they do not receive more than the amount of their loss, even when the policy contains an anti-stacking clause." *Id.*

In *Taylor,* the court described the wife as trying to recover under two different coverage types, liability and UIM, with an offset to avoid duplication of benefits. She was not asking to stack limits which is "the practice by which insureds may seek indemnification from the same coverage under two or more policies." *Id.* "If she were trying to recover $600,000 under the combined liability and UIM coverage of the policy, she would be trying to stack limits." *Id.* The logic is to preclude stacking of liability and UIM coverage from one policy because it increases liability coverage beyond what the

insured had purchased. *Cf. Duran v. Hartford Ins. Co. (Duran I),* 772 P.2d 577, 578 (Ariz. 1989) (explaining distinction from disallowed off-sets that preclude stacking in cases with two tortfeasors and two insurance policies because this prevented insured from obtaining benefits they had purchased in the different policies).

According to Defendants, their Policy insured four vehicles and under case law developed since *Taylor,* Wife is "entitled to liability coverage of the vehicle involved in the accident and UIM coverage as to another insured vehicle." (D Reply (Doc. 39) at 3 (citing *Sharp*, *Hoelbl v. Geico Gen Ins. Co.,* 2012 WL 5589909 (Ariz. App Nov. 15, 2012), *review denied; GEICO Gen Ins. Co. v. Tucker,* 71 F.Supp 3d 985 (Ariz. 2014)).

Insurers may prohibit stacking under Arizona's Uninsured/Underinsured Motorist Act (UMA), A.R.S. § 20–259.01 (2002 & Supp.2011), which requires all insurers offering motor vehicle liability policies to also offer these coverages, with underinsured motorist (UIM) coverage extended to and covering "all persons insured under the policy, in limits not less than the liability limits for bodily injury or death contained within the policy." A.R.S. § 20–259.01(B). UIM coverage applies when an insured's total damages exceed all applicable liability limits, subject to any valid limitations the insurer imposes. *American Family Mut. Ins. Co. v. Sharp,* 277 P.3d 192, 193 (Ariz. 2012) (citing A.R.S. § 20–259.01(G)–(H)). "But any 'exceptions to [UIM] coverage not permitted by the [UMA] are void.'" *Id.* (quoting *Taylor*, 9 P.3d at 1054 (2000) and citing *Cundiff v. State Farm Mut. Auto. Ins. Co*., 174 P.3d 270, 272 (Ariz. 2008)).

The Arizona statute mandating UM and UIM insurance expressly allows insurers to preclude stacking UIM coverages from separate policies purchased by the insured from the same insurer, in relevant part as follows: "If multiple policies or coverages purchased by one insured on different vehicles apply to an accident or claim, the insurer may limit the coverage so that only one policy or coverage, selected by the insured, shall be applicable to any one accident. If the policy does not contain a statement that informs the insured of the insured's right to select one policy or coverage as required by this subsection, within thirty days after the insurer receives notice of an accident, the insurer shall notify the

insured in writing of the insured's right to select one policy or coverage. For the purposes of this subsection, 'insurer' includes every insurer within a group of insurers under a common management." A.R.S. § 20–259.01(H).[1]

In *Sharp,* the wife recovered full liability coverage under a policy issued on a motorcycle driven by her husband, whose negligence caused passenger- wife's injury. Additionally, wife sought full UIM coverage under a different policy issued by the same insurer for her car. Insurer argued that an anti-stacking policy provision precluded her recovery of UIM benefits under the car policy because she had recovered full liability benefits under the motorcycle policy. The case was filed in federal court which certified questions to the Arizona Supreme Court requiring it to address the interplay between Subsections (G) and (H) of A.R.S. § 20–259.01. Subsection (G) provides: "Underinsured motorist coverage includes coverage for a person if the sum of the limits of liability under all ... liability insurance policies applicable at the time of the accident is less than the total damages for bodily injury ... resulting from the accident. To the extent that the total damages exceed the total applicable liability limits, the [UIM] coverage ... is applicable to the difference."

In *Sharp,* the insurer urged the court to conclude that Subsection H, allowing insurers to preclude stacking when there are "multiple policies or coverages," allows insurers to preclude stacking of "all available coverages, regardless of type." *Sharp,* 277 P.3d at 196. The court in *Sharp,* held that such a reading could "limit an insured's recovery for all accident-related damages to only one type of selected coverage, whether it be for medical payments, rental car reimbursement, property damage (under the collision coverage), liability, or UIM, regardless of the number of policies issued, coverages

---

[1] The "Liability Coverage Part," Provision C, relied on by Plaintiff, which precludes duplicate payments for the same elements of loss, does not expressly preclude stacking UIM coverages nor inform the insured of his or her right to select one policy or coverage as required under A.R.S. 20-259.01(H). The Court does not question whether Subsection C, Liability Coverage, is an enforceable anti-stacking restriction pursuant to Subsection H; this factor is not relevant to the inquiry before the Court. *See Rashid v. State Farm Mut. Auto. Ins. Co.,* 787 P.2d 1066, 1071 (Ariz. 1990) (distinguishing between coverage limit put in a policy by insurer compared to anti-stacking restrictions included in policy pursuant to Subsection H so that only one policy or coverage, selected by the insured, applies to any one accident).

purchased, premiums paid, or vehicles covered." *Id.* The court found no indication in Subsection (H) or elsewhere that the legislature intended that result, particularly in light of the UMA's broad remedial purpose [as reflected in Subsection G]." *Sharp,* 277 P.3d at 196-97.

The court in *Sharp* based its conclusion on the terms of the UMA and its overarching purpose, but also on case law. Finding no prior decision directly controlled the issue, it looked at *Taylor* and *State Farm Mut. Auto. Ins. Co. v. Wilson*, 782 P.2d 727, 734 (Ariz. 1989) as recognizing that liability insurance is distinct from first-party UIM coverage. It noted *Taylor's* conclusion that UMA has a remedial purpose and must be construed liberally in favor of coverage, with strict and narrow construction given to offsets and exclusions. UMA provides that "'[i]nsurers [may] justifiably include other insurance clauses to prevent the insured from duplicating recovery,' [but] most courts have found that 'insurers violate the public policy embodied in the UM/UIM statutes by inserting clauses that permit them to reduce or eliminate coverage when the victim/insured has not been fully compensated.'" *Id.* at 197 (quoting *Brown v. State Farm Mut. Auto. Ins. Co.*, 788 P.2d 56, 61 (1989)); *cf. Rashid*, 163 Ariz. at 273, 787 P.2d at 1069 (finding a premium is paid for each of the coverages and, therefore, it is both equitable and desirable to permit recovery under more than one coverage until the insured is fully indemnified).

The court rejected the argument that *Taylor* supported a contrary conclusion and distinguished *Taylor* to circumstances where an insured was seeking "to fill the gap between the amount she received from all applicable liability coverages and her UIM coverage limits." *Id.* (citing *Taylor,* 9 P.3d at 1051, 1060). Unlike *Taylor,* in *Sharp,* the wife sought UIM coverage under her car policy, but had received the liability payment under a separate motorcycle policy. The court in *Sharp,* following *Taylor's* offset to limit recovery so that wife did not receive more than she purchased, likewise, held Sharp should not be denied UIM coverage for the accident which she had purchased under a separate policy from the liability policy covering her spouse's motorcycle. The rational in *Sharp*

1    was that she should not receive less than she purchased. *Id.* The court concluded that Sharp

2    was not seeking to duplicate recovery. *Id.* at 198.

3         Defendants correctly argue: "Since *Taylor*, Arizona courts have further expanded

4    an insured's entitlement to both liability coverage and UIM coverage for the same

5    accident." In *Sharp*, the Arizona Supreme Court concluded an insured can recover liability

6    coverage under one policy and UIM coverage under another policy for injuries sustained

7    in one accident, and it violates UMA if an insurer denies coverage due to stacking in this

8    situation. *Sharp,* 277 P.3d at 491-93.  "In *Hoelbl v. Geico Gen. Ins. Co*., No. 1 CA-CV 11-

9    0703, 2012 WL 5589909 (Ariz. App. Nov. 15, 2012), *review denied*, the Arizona Court of

10   Appeals held that *Sharp* applies in the same manner if an insured has multiple vehicles

11   insured under the same policy." (D Reply (Doc. 39) at 3) (citing *Hoelbl,* 2012 WL 5589909,

12   at *5 (discerning no distinction from fact that multiple coverages were memorialized in

13   one policy or several policies). "The insured can recover liability coverage pursuant to the

14   coverage of the vehicle involved in the accident and UIM coverage under the coverage of

15   a separate vehicle insured under the policy." *Id.* (relying on *Hoelbl* relying on *Sharp*).

16        Recognizing that *Hoelbl* is not precedent, the Court relies on it to assess how

17   Arizona courts would rule in this case under *Sharp. See GEICO Gen Ins.Co. v. Tucker*, 71

18   F.Supp.3d 985, 987 (citing *Burns v. Int'l Ins. Co*., 929 F.2d 1422, 1424 (9th Cir. 1991)

19   (directing federal courts ruling in diversity to look to state courts of appeals to provide

20   guidance and instruction unless there are convincing indications that the state supreme

21   court would hold otherwise)). This Court, like the court in *Tucker,* looks to how the court

22   in *Hoelbl* applied Arizona law, which included *Sharpe* and *Taylor.* Finding *Hoelbl* to be a

23   well-reasoned application of both, this Court applies them similarly and concludes there is

24   no substantive distinction to the fact that Defendants secured separate coverage of four

25   vehicles pursuant to one policy rather than under separately issued policies as was the case

26   in *Sharp.* The Defendants are entitled to receive the coverage they purchased which

27   includes liability coverage purchased under the policy on the car involved in the accident

28   and $250,000 in UIM coverage under any other car covered by the Policy.

1    *Sharp* is consistent with the Settlement Agreement which acknowledges that Wife

2    received $250,000 UIM coverage pursuant to the Travelers policy, (JSOF, Ex. 1:

3    Settlement Agreement (Doc. 32-1) ¶ II.F; her claim exceeds $500,000, *id.* ¶ G; Travelers

4    tendered liability coverage of $25,000 pursuant to the challenged step-down, which wife

5    refused and sued Husband in state court, *id.* ¶¶ II.C-D, H; such suit was dismissed with the

6    parties agreeing Wife is to be paid either $25,000 or $250,000 of liability coverage based

7    on the Court's ruling, *id.* ¶¶ III.3-4.) There is no support for Plaintiff's argument that a valid

8    anti-stacking provision in the Policy precludes Defendants' recovery for liability benefits

9    totaling $250,000, if the doctrine of reasonable expectations applies to avoid the step-down

10   in liability coverage to $25,000. On this issue, the parties essentially filed crossmotions for

11   summary judgment. The Court turns to the question of whether Defendants are entitled to

12   $25,000 or $250,000 in liability coverage, and shall enter Judgment in the case,

13   accordingly.

14             B.      Crossmotions for Summary Judgment

15            Federal Rule of Civil Procedure 56(a) provides for summary judgment when "there

16   is no genuine dispute as to any material fact and the movant is entitled to judgment as a

17   matter of law." Material facts are facts that may affect the outcome of the case. *Anderson*

18   *v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is sufficient

19   evidence for a reasonable jury to return a verdict for the nonmoving party on a material

20   question of fact. *Id.*  On summary judgment, the court may not weigh the evidence and

21   must view the evidence in the light most favorable to the nonmoving party. *Id.* at 255. In

22   short, the standard for granting summary judgment mirrors the standard for a directed

23   verdict under Fed. R. Civ. P. 50(a): "whether the evidence presents a sufficient

24   disagreement to require submission to a jury or whether it is so one-sided that one party

25   must prevail as a matter of law." *Id.* at 251-252.

26            The party moving for summary judgment bears the initial burden of informing the

27   court of the basis for its motion and of identifying those portions of the pleadings or

28   materials in the record that demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A moving party having the burden of proof at trial "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007) (relying on *Celotex,* 477 U.S. at 323). Where the moving party's opponent will have the burden of proof at trial, the moving party can prevail merely by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial to defeat the motion. *Anderson*, 477 U.S. at 250.

Here, the parties submit crossmotions for summary judgment, both seeking to prevail based on whether Defendants may avoid a step-down to $25,000 in liability coverage under the doctrine of reasonable expectation. The Court considers each motion on its own merits to determine for each party whether judgment may be entered in accordance with Rule 56. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Because the Court must construe the evidence and any inferences derived from evidence in favor of the nonmoving party, on cross motions, the Court asks whether either side must prevail if the evidence and inferences are construed in favor of the other.

Ultimately, however, in this case the Court will decide any genuine questions of material fact that are in dispute because the parties do not seek a jury trial and agree to a bench trial. On summary judgment, the parties have filed a complete evidentiary record supporting their arguments relevant to determine whether the doctrine of reasonable expectations applies to the step-down coverage limit in the Policy. Given the posture of the case as described by the parties in the Rule 26 Joint Report, the Court believes the parties intended for the Court to resolve even disputed questions of fact on summary judgment, but such fact finding is unnecessary.  The Court finds this case appropriate for summary judgment because there are no disputed questions of material fact to be resolved at trial.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C.     Doctrine of Reasonable Expectations

The accident occurred on May 31, 2021. The 2020-2021 Automobile Policy Declarations, Coverages, Limits of Liability and Payments, reflects limits for each category of coverage, including bodily injury liability of "$250,000 each person, $500,000 each accident ($250,000/$500,000)." (JSOF, Ex. 3: Policy 2021-22 (Doc. 32-8) at 9.) There are no related asterisks, footnotes, or other special directives or qualifiers. The cover page welcoming Defendants as new customers told them to review the policy documents and "confirm your new insurance policy details, including: "Your Declarations page, listing the coverage you purchased, your coverage limits and deductible." *Id.* at 2.

The step-down provision is found in the Liability Coverage Section of the Policy, Exclusions, "[f]or bodily injury to you or any 'resident relative,' to the extent that the limits of liability for this coverage exceeded the minimum limits." (JSOF, Ex. 2: 2019-2020 Policy, Liability Coverage Section (Doc. 32-4) at 3.) It is undisputed that "resident relative" includes a spouse. The General Provisions Section,[2] General Definitions, defines "Minimum limits" as referring "to the minimum limits of liability as required by Arizona law, to be provided under a policy of automobile liability insurance." (JSOF, Ex. 3: Policy 2021-22 (Doc. 32-8) at 13.) Plaintiff relies on the exclusion to assert that liability coverage for Defendant Wife is stepped-down to the statutory minimum limit, $25,000, not the $250,000 policy limit reflected in the declaration page.

According to Defendants, they were not aware of the step-down limit in coverage for family members residing in their home and only discovered the limitation after the accident. They expected that the $250,00/$500,000 coverage limits for bodily injury liability, which were reflected on the Policy declaration page, would not be any different for members of the family living in their home that might be injured in an accident. (D MSJ, SOF, Ex. B: K. Gee Decl.  ¶¶ 8-9 (Doc. 29-6) at 2-3; Ex. C. S. Gee Decl. ¶¶11-12,

_____

[2] Resident relative is not defined, but the Policy definition for "You" or "Your" refers to the named insured and "spouse if a resident of the same household."  (JSOF, Ex. 3: Policy 2021-22 (Doc. 32-8) at 13.)

15 (Doc. 29-7) at 3.) Plaintiff does not challenge the Defendants' alleged subjective expectation.

Since 1982, it has been well settled law in Arizona that terms of a standardized insurance contract may be unenforceable if they are beyond the reasonable expectations of the insured. *Sparks v. Republic National Life Ins. Co*., 647 P.2d 1127 (Ariz. 1982) and *Zuckerman v. Transamerica Ins. Co*., 650 P.2d 441 (Ariz. 1982). In 1984, the Arizona Supreme Court provided guidance to lower courts for how and when to apply the doctrine in *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co*., 682 P.2d 388 (Ariz. 1984). In *Darner,* the court recognized that the usual insurance policy is a special kind of contract, largely adhesive, with "some terms being bargained for, but most terms consist[ing] of boilerplate, not bargained for, neither read nor understood by the buyer, and often not even fully understood by the selling agent." *Id.* at 395. The court, "to accommodate the practices of the marketplace," adopted §211 of the Restatement (Second) of Contracts as the test for determining whether standard terms are within the reasonable expectations of the parties and are to be enforced. *Id.* at 395-96.

The Restatement (Second) of Contracts contains a workable resolution when dealing with standardized agreements containing "dickered" terms of agreement and boilerplate provisions which are not negotiated and often not even read by the parties. In such a case, the contract is binding as an integrated agreement without regard to the parties' knowledge or understanding, except "'[w]here the other party has reason to believe that the party manifesting such assent would not do so if he knew that the writing contained a particular term, the term is not part of the agreement.'" *Darner,* 682 P.2d at 395-6.

*Darner* described the doctrine in comparison to various contract law constructs that allow courts to reach a desired result, which give lip service to traditional contract rules and apply principles for addressing ambiguity to achieve a desired result, such as resolving ambiguities against the draftsman or applying the parole evidence rule illogically to rely on an unexpected, unknown ambiguity in a clause which the parties did not negotiate, write or read to permit them to show the true terms of the agreement. *Id.* at 394.

These machinations are unnecessary under the doctrine of reasonable expectations. Under the doctrine, "Arizona courts will not enforce even unambiguous boilerplate terms in standardized insurance contracts in a limited variety of situations." *Gordinier v. Aetna Casualty*, 742 P.2d 277, 283 (Ariz. 1987). Such situations include, the following: 1) where terms, not considered ambiguous by the court, cannot be understood by the reasonably intelligent consumer who might check on his or her rights, then the court will interpret them in light of the objective, reasonable expectations of the average insured; 2) where the insured did not receive full and adequate notice of the term in question, and the provision is either unusual or unexpected, or one that emasculates apparent coverage; 3) Where some activity which can be reasonably attributed to the insurer would create an objective impression of coverage in the mind of a reasonable insured, and 4) where some activity reasonably attributable to the insurer has induced a particular insured reasonably to believe that he has coverage, although such coverage is expressly and unambiguously denied by the policy. *Gordinier,* at 283-84 (citations omitted).

The doctrine is a limited exception that applies only if two predicate conditions are present: 1) the insured's "expectation of coverage must be objectively reasonable,*" Millar v. State Farm Fire and Cas. Co*., 804 P.2d 822, 826 (Ariz. App. 1990), and 2) the insurer "must have had a reason to believe that the [insured] would not have purchased the... policy if they had known that it included the complained of provision*," State Farm Fire & Cas. In. Co. v. Grabowski*, 150 P.3d 275, 280-81 (Ariz. App. 2007).

The first predicate condition is an inquiry into the subjective expectation of the insured and whether such expectation was objectively reasonable. The insured must have more than a "fervent hope" coverage exists. *Grabowski*, 150 P.3d at 279 (citing *Darner*, 682 P.2d at 395.) The insured may establish the second predicate condition, the insurer's belief or assumption, with circumstantial evidence and by inference. *Id.* Arizona courts consider several factors which go to show whether the insurer had reason to believe that the insured would not have assented to an objectionable term: (1) the parties' prior negotiations, (2) the circumstances of the transaction, (3) if the term is bizarre or

oppressive, (4) if the term eviscerates the non-standard terms to which the parties explicitly agreed, and (5) if the term eliminates the dominant purpose of the transaction. *Grabowski*, 150 P.3d at 280 (citing *Darner*, 682 P.2d at 397, and Restatement § 211 cmt. f). Arizona courts may consider any relevant facts, such as whether the challenged policy provision can be understood if the customer does attempt to check on his or her rights. *Harrington v. Pulte Home Corporation*, 119 P.3d 1044, 1051 (Ariz. App. 2005). An inference may be reinforced if the insured never had an opportunity to read the term or if it is illegible or otherwise hidden from view. *Grabowski*, 150 P.3d at 280 (citing *Darner,* 682 P.2d at 397).

"Thus, in determining whether a standardized contract term should be enforced, a court will focus on the drafter's behavior and grant relief to remedy overreaching by the drafter. As explained, circumstantial evidence is critical to such a determination." *Id.* Under *Darner,* Defendants do not have to show an ambiguity in the Policy provision.

### 1.   Plaintiff's Dispositive Motion

Plaintiff argues the Defendants may not seek relief under the doctrine of reasonable expectations because they speak Cantonese, not English. Plaintiff submits: "Objectively, it is unreasonable for anyone to have a legitimate expectation regarding coverage when they cannot communicate with the seller of the insurance policy." (Plaintiff's Reply Supporting MPSJ (P Reply) (Doc. 38) at 6.) "Again, given the language barrier, the Defendants were unable to meaningfully communicate with anyone regarding any expectation with coverage," *id.,* rendering it an impossibility for Plaintiff to have any reason to believe Defendants would have rejected the Policy because of the step-down coverage limit.

It is undisputed that Defendants cannot read English, they immigrated to the United States in mid to late 1980, and were naturalized in 1997. They took English classes, but their primary language remains Cantonese. Defendants have what is fairly described as a limited command of the English language. *See* (P MPSJ, Ex. 1: P Attorney Reeves Affidavit, Gees' Depositions (Doc. 30-1) at 95-120 (reflecting some difficulty understanding deposition questions and admissions of limitations related to communications in English), (D MSJ, SOF, Ex. B: K. Gee Decl. ¶ 3,5 (Doc. 29-6) at 2

(admitting little understanding of English and to not using it in daily activities and work), (D MSJ, SOF, Ex. C: S. Gee Decl. ¶¶ 6-7 (Doc. 29-7) at 2 (explaining she took English classes and has basic understanding of English words and phrases, and able to run restaurant business because most business is conducted in both English and Chinese, and they have employees and others who help with language issues).

Plaintiff's position that the language barrier precludes any objectively reasonable expectation related to coverage relies on Defendants' assertion that they communicated their expectations by showing Plaintiff's agent a copy of a declaration page from another policy which reflected $250,000 in liability coverage. Defendants' ability to read numbers and understand monetary amounts are not at issue. Plaintiff argues that the declaration page Defendants showed Plaintiff's agents reflected coverage comparable to what Defendants had purchased in the past, which "likely" included step-down coverage and, therefore, any expectation that the Policy would not include step-down coverage was objectively unreasonable. (P Reply (Doc. 38) at 4, 8.)

Plaintiff's counsel may be confused because Defendants do not allege that the declaration page they showed to Plaintiff's agent was from a past policy. (D MSJ, SOF, Ex. B: K. Gee Decl. ¶ 8 (Doc. 29-6) at 2; Ex. C: S. Gee Decl. ¶10 (Doc. 29-7) at 3; Ex. C: Safeco Policy Declarations (Doc. 29-7) at 5-7.) It was a quote from Safeco, which the Court has reviewed and finds no evidence that it included step-down coverage. *Id.* The Court assumes the Plaintiff means that a prior policy Defendants had with Plaintiff in 2015 included step-down coverage. For purposes of this motion, the Court accepts Plaintiff's assertion the policy it issued to Defendants in 2015 included step-down coverage and that this history of interaction between the parties undercuts Defendants' circumstantial evidence to create an inference that Plaintiff had reason to believe the Defendants would have assented to the allegedly objectionable step-down in coverage.

Plaintiff asserts that the Safeco policy quote "likely" included a step-down coverage provision because most polices do.  Plaintiff relies on its agent's attestation that she did not believe full coverage, without a step-down coverage limit, existed as an insurance option

in Arizona, and if Defendants had asked for full coverage, without limitation, she would have told them as much. Plaintiff does not assert no full coverage policies are issued in Arizona, and Plaintiff's agent's attestation does not establish that most policies are "likely" to include resident family liability step-down limits. Similarly, Plaintiff asserts that the Arizona Department of Insurance permits step-down resident family coverage and this goes to show that "most, if not all, automobile insurance policies sold in Arizona include step-down coverage limits."

To be clear, Defendants do not have to disprove any of Plaintiff's above assertions. At best these go to show that the step-down provision was not exceptional to rebut an inference that the insurer, Plaintiff, had a reason to believe the insured would reject the policy containing the coverage step-down limit. The Court does not find the step-down limit to liability coverage in the Policy is bizarre.

The Court, however, rejects Plaintiff's suggestion that given the general adoption by the insurance industry of step-down coverage limits and how hard it is to obtain full coverage without it, an insured can only form an objectively reasonable belief of obtaining full coverage, without exclusion, by undertaking herculean measures to obtain such unlimited coverage. The Court refers to Plaintiff's arguments "pointing out that step down provisions are commonplace given the inherent collusion that can arise when family members sue one another in an effort to trigger insurance coverage." (P Reply (Doc. 38) at 6 n 3, 8.) (citation omitted). Likewise, Plaintiff points out the subsequent efforts Defendants undertook to procure such coverage, which included assistance from their attorney, who too mistakenly secured a policy after being assured it provided full coverage that included a step-down coverage limit for resident family members, before finally finding a policy without the limitation.

In short, the Court accepts that it is difficult to secure coverage corresponding to the limits reflected on a policy declaration page that is not subject to any boilerplate resident family step-down limitation. If anything, however, Plaintiff's evidence reflects a boilerplate provision stepping down bargained for coverage limits that is covered by the

reasonable expectation doctrine, which serves to address precisely this situation, commonly occurring in insurance policies, where some terms are bargained for and others are boilerplate, "not bargained for, neither read nor understood by the buyer, and often not even fully understood by the selling agent." *Darner*, 682 P.2d at 395.

The Court addresses Plaintiff's primary argument that Defendants speak Cantonese and were incapable due to a language barrier of communicating their alleged subjective expectations for full coverage, without limitation, making any such expectation objectively unreasonable. Plaintiff argues that because it was impossible to discern Defendants' expectation, Plaintiff could not have had any reason to believe Defendants would not have purchased the Policy if they knew it contained the step-down limitation of coverage.

Plaintiff comes dangerously close to asserting incapacity to contract while ignoring the fiduciary duties owed by an insurer to an insured. It should go without saying or citation to supporting case law, that an insurer cannot use an insured's inability to communicate in English as a sword against the insured to defeat coverage by shielding itself from an insured's reasonable expectations.

"[B]efore a binding contract is formed, the parties must mutually consent to all material terms. A distinct intent common to both parties must exist without doubt or difference, and until all understand alike there can be no assent." *Hill-Shafer P'ship v. Chilson Family Tr.*, 799 P.2d 810, 814 (Ariz. 1990). More importantly, an insurer owes its insured "'some duties of a fiduciary nature,' including '[e]qual consideration, fairness and honesty.'" *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279 (Ariz. 2000 (quoting *Rawlings v. Apodaca*, 726 P.2d 565, 571 (Ariz. 1986)). Specifically, "[u]nder Arizona's common law, insurance agents owe a duty of reasonable care when obtaining insurance on behalf of their clients." *Wilks v. Manobianco*, 352 P.3d 912, 914 (Ariz. 2015) (relying on *Webb v. Gittlen* 174 P.3d 275, 279 (Ariz. 2008), *Darner*, 682 P.2d at 402). "That duty is founded on an agent's status as one with 'special knowledge,' who 'undertakes to act as an advisor' to a client." *Id.* (quoting *Darner*, 682 P.2d at 402; *see also* Restatement

(Third) of Agency § 8.08 (explaining an agent possess special skills or knowledge and has a duty to act with the care, competence, and diligence).

The Court does not make a finding of fact related to Defendants' English competency, such as weighing Defendants' evidence that given their admittedly limited command of the English language, they nevertheless own and run a successful restaurant business versus Plaintiff's proffer that Defendants can only speak to customers in English about menu selections. The Court has reviewed the evidence posited by Plaintiff and finds it does not reflect the Defendants lacked the ability to communicate their expectations to Plaintiff's agent,[3] Nancie Gamble with Holvorson Insurance, Inc., believed the Defendants lacked the capacity to communicate their coverage expectations to her.

Plaintiff's agent had a history with Defendants and had previously provided insurance coverage for them in 2015; she knew they owned and operated the Golden Dragon restaurant in Tucson. Plaintiff's agent admits that she "knew their primary language was Chinese of some kind," she didn't speak Cantonese and she communicated with Defendants in English, including the discussions related to the Safeco declaration page and the quotes and declaration page she presented to Defendants were in English. When she sold them the Policy, she discussed with them requisite rating factors, like who the drivers were in the household, if they drove and how far they drove to work.  (D MSJ, CSOF, Ex. E: Gamble Depo. Transcript of Record (TR) 19-23 (Doc. 29-10) at 3-4.) She correctly understood Defendants' information that their daughter did not reside with them and insured her, accordingly; she was not considered a resident family member and was

---

[3] The Settlement Agreement applies to Plaintiff, its subsidiaries, parent corporations, etc., and agents. (Settlement Agreement (Amended Answer) (Doc. 6.1) ¶ I.C.) Plaintiff ignores the Settlement Agreement and legal implications that flow from this agency relationship to argue that because "no direct negotiations occurred between Travelers and Defendants," Defendants cannot show the Plaintiff had reason to believe that Defendants would not have purchased the policy had they known of the step-down provision. *But see* (D Resp, P MPSJ (Doc. 34) at 6 (citing *Stewart v. Mutual of Omaha Ins. Co.*, 817 P.2d 44, 52 (Ariz. 1991) (finding knowledge of insurance agent, as a matter of law, is knowledge of the company even if the information is not actually communicated to the insurance company by the agent) (further citation omitted)). For purposes of the crossmotions, the Court finds that as a matter of undisputed fact, Holvorson was Traveler's agent, and applies the law accordingly.

covered for $250,000 bodily injury without exclusion. (D MSJ, SOF, Ex. B: K. Gee Decl. ¶10 (Doc. 29-6) at 3; Ex. C: S. Gee Decl. ¶¶ 13-14 (Doc. 29-7) at 3.) According to Plaintiff's agent, she communicated well with Defendant Wife; Plaintiff's agent "had no problem communicating with her." (D MSJ, CSOF, Ex. E: Gamble Depo. Transcript of Record (TR) 17 (Doc. 29-10) at 3.) She made small talk with Husband in English but regarding the Policy, Husband would ask Wife questions in Cantonese, Wife would ask Plaintiff's agent in English and translate answers to Husband. *Id.*

The Court finds that Defendants communicated their expectations of coverage to Plaintiff's agent and that they did so through Defendant Wife's use of the English language and by producing the Safeco declaration page, which reflected liability coverage limits of $250,000/$500,000. It is a red herring to argue that Defendants' limited English created a language barrier that precluded them from forming any objectively reasonable expectation as to whether coverage under the Policy included a step-down "resident family" limitation.

The Plaintiff's approach tips the duty of care on its head, requiring an insured, lacking an agent's special knowledge of the insurance industry, to have expectations in conformity with insurance industry standards. *See State Farm Mut. Auto. Ins. Co. v. Falness*, 39 F.3d 966, 967-68 (9th Cir. 1994) (criticizing policy coverage language that might communicate clearly to a person trained in the law or the insurance business; examining policy clarity based on what a reasonable person purchasing the policy would understand and expect). Defendant need only show that their expectation was one that could be held by a reasonably intelligent consumer. *Gordinier,* 742 P.2d at 283. The Court finds such a consumer would not be privy to the industry related facts relied on by Plaintiff to argue the only objectively reasonable expectation was the step-down limit in liability coverage for resident family members.

The Plaintiff mistakenly posits as "instructive" unpublished federal cases applying Arizona state law: *American Family Mut. Ins. Co. v. Verdugo*, 2016 WL 9458582 (D. Ariz. 2016 and *Twin City Fire Ins. Co, v. DanceIt! Studio LLC,* 2024 WL 405071 (D. Ariz. 2024). These cases are both distinguishable.

The federal district court concluded in *DanceIt!* that an expectation of coverage for trampoline injuries was not objectively reasonable because the insured did not tell the agent that DanceIt! owned, maintained, used or expected to use, trampolines of any kind. *DanceIt! Studio LLC,* 2024 WL 405071 at *5. Prior negotiations between the insurer and insured were related to securing general liability coverage for the business required by the landlord. The insurer only knew the insureds were operating a fitness center and giving fitness classes. There was no information available to the insurer that would even suggest trampolines could be used in the business or classes. There was literally no mention whatsoever of trampolines. Additionally, the exclusion was clearly stated in the policy and did not negate any other coverage provided under the policy. The insured did not dispute that if they had attempted to check on their rights, there was nothing in the policy exclusion they could not understand.

The Defendants in this case did not keep the insurance agent in the dark. They expressly asked for coverage limits of $250,000/$500,000. Not only did the agent not responsively inform the Defendants that the Policy included an exception to these coverage limits, but the Plaintiff's agent also admittedly believed such full coverage policies were not a coverage option. The agent's ignorance likely led to her conclusion that the step-down coverage limit was a non-negotiable boilerplate provision that Defendants would have to accept because it was contained in every policy sold in Arizona. She did not discuss such boilerplate provisions with customers. Additionally, the Plaintiff drafted the Policy so that the declaration page reflected coverage of $250,000 per person and $500,000 per accident, without reflecting any limitation. The declaration page could easily have noted the liability coverage limitation. For example, the declaration page noted the deductibles for Collision and Comprehensive coverage and referenced specific Endorsement sections of the Policy for coverage of Extended Transportation Expenses, New Car Replacement, and Roadside Assistance (JSOF, Ex. 3: Policy 2021-22, Declarations (Doc. 32-8) at 10.) In this case, the insurer kept the insured in the dark.

1      According to Plaintiff, this Court should look to its ruling in *Verdugo* where
2  according to Plaintiff, it held that no objective expectation of coverage can arise when a
3  language barrier exists. This was not the holding in *Verdugo*. Instead, this Court found in
4  *Verdugo* that the insured presented no evidence to support the assertion that they did not
5  understand the policy exclusion because they spoke Spanish and the policy was in English.
6  Citing to the evidentiary record in the case, this Court rejected as it does here allegations
7  of a language barrier. In *Verdugo,* the clarity of the stated exclusion in the policy precluded
8  any other objectively reasonable expectation.

9      Unlike the policy considered in *Verdugo*, the Policy language drafted by the Plaintiff
10  was not clear because the declaration page reflected a $250,000 limit for individual
11  liability, which was directly at odds with the boilerplate step-down coverage limit of
12  $25,000. *Compare* (JSOF, Ex. 2: 2019-2020 Policy, Declaration (Doc. 32-3) at 9 *with*
13  Exclusion (Doc. 32-4) at 3). Additionally, the step-down was not clearly reflected as
14  $25,000 in coverage for spouses. Instead, the Policy described the step-down "to the extent
15  that the limits of liability for this coverage exceeded the minimum limits." (JSOF, Ex. 2:
16  2019-2020 Policy, Exclusion (Doc. 32-4) at 3.) This is confusing because without knowing
17  that the "minimum limit" meant $25,000 not the $250,000 limit reflected on the Policy
18  declaration page, a reasonably intelligent consumer could believe there is actually no step-
19  down under the boilerplate provision.

20      The "Minimum limit" definition in the 2021-22 Policy step-down provision refers
21  "to the minimum limits of liability as required by Arizona law, to be provided under a
22  policy of automobile liability insurance," as compared to the 2019-20 policy which
23  reflected the actual statutory stepped-down coverage limits of $15,000/$30,000. *Compare*
24  (JSOF, Ex. 3: Policy 2021-22, Definitions (Doc. 32-8) at 13) *with* (JSOF, Ex. 2: 2019-2020
25  Policy, Definitions (Doc. 32-4) at 6.) Both years, the Policy step-down exclusion did not
26  place the term "minimum limit" in quotation marks. *See* (JSOF, Ex. 2: 2019-2020 Policy,
27  Liability Coverage Section, Exclusions (Doc. 32-4) at 3). Plaintiff failed to flag the

28

distinctive meaning and need to check the entirely separate "Definitions" section of the Policy containing the unique statutory step-down coverage limit language.

In this situation, a reasonably intelligent consumer who checked the Policy could conclude "minimum limit" means the amount the parties expressly negotiated as reflected on the declaration page, which the cover page accompanying the Policy expressly directed them to review in respect to limits for coverage.

The Court focuses on the drafter's behavior, *Grabowski*, 150 P.3d at 280 (citing *Darner*, 682 P.2d at 397), when considering if circumstantial evidence warrants application of the reasonable expectation doctrine or whether a standardized contract term should be enforced.

Here, Plaintiff's agent admits that she did not provide notice to Defendants related to the step-down boilerplate provision. She was asked if it was true that for car insurance customers she did not go over the specific exclusions to coverage, but basically went over the nature of the coverages themselves, "such as liability, uninsured motorist, underinsured, medical payments, things of that sort?" She responded "That would be correct, on car insurance." She added that on home insurance, "there would be, like, termites, there's some very basic exclusion that I go over." (D SOF, Ex. E: Gamble Depo. TR 21 (Doc. 29-10) at 4.)

She tells customers that they will get the policy in the mail and that they, like many people, may read it and then call if they have questions. She explains insurance, generally, and focuses on the coverage provisions including UIM and UM and the corresponding coverage limits. She focuses on policy provisions that are negotiable, not boilerplate terms that are nonnegotiable. She does not explain exclusions. (D MSJ, CSOF, Ex. E: Gamble Depo. TR 19-23 (Doc. 29-10) at 3-4.)

When the Policy did arrive, Plaintiff included a cover letter that directed Defendants to review the following: "declaration page for coverage limits and deductibles, the insurance ID cards, Insurance policy and endorsements, [and] other important documents including our privacy notice, billing options and more." (JSOF, Ex. 2, 2019-20 Policy

(Doc. 32-2) at 3.) If Defendants had reviewed the Policy, they would have seen an Index reflecting Liability Coverage Section Coverage A—Bodily Injury and Coverage B—Property Damage, with only the Property Damage section including Exclusions and Limit of Liability provisions. A reasonably intelligent consumer may have concluded there were no liability exclusions or limits for bodily injury, and not looked closer. Only upon reviewing the boilerplate provisions in the Liability Coverage—Bodily Injury section would a reasonably intelligent consumer have seen that the Policy included a step-down in liability coverage for the insured and any "resident relative," and there remained the confusion described above related to the Definition Section of the Policy.

Additionally, the Defendants purchased the Policy in 2019 and renewed it in 2020. The renewal package sent to Defendants by Plaintiff contained the same cover page directive for Defendants to review the limits of coverage reflected on the declaration page. (JSOF, Ex. 3: Policy 2021-22 (Doc. 32-8) at 2.) In the renewal materials, however, the Plaintiff deleted the reference to review the policy and endorsements. *Id.* The renewal package also included a two-page document entitled "IMPORTANT NOTICE" that contained a discussion of the changes in the Arizona statutory minimum limits for liability from $15,000/$30,0000 to $25,000/$50,000, without any explanation as to how this affected the Defendants' coverage. *Id.* 7. The IMPORTANT NOTICE explained that UM and UIM policy provisions had been changed accordingly in response to the statutory amendment but failed to mention the step-down in liability coverage for resident family members had also changed. *Id.* Again, Plaintiff ignored the boilerplate provision in the Policy that significantly eviscerated the negotiated liability coverage of $250,000/$500,000.

In short, Plaintiff acted as if the step-down coverage did not exist in the Policy until after the accident. The approach taken by Plaintiff would negate *Darner's* "workable resolution when dealing with standardized agreements containing "dickered" terms of agreement and boilerplate provisions which are not negotiated and often not even read by the parties. In such a case, the contract is binding as an integrated agreement without regard

to the parties' knowledge or understanding, except "'[w]here the other party has reason to believe that the party manifesting such assent would not do so if he knew that the writing contained a particular term, the term is not part of the agreement.'" *Darner,* 682 P.2d at 395-6. This case falls under the exception.

Based on undisputed facts found within the four corners of the Policy and attendant documents as drafted by the Plaintiff, the Court finds that the step-down coverage limit would not be understood by the reasonably intelligent consumer who might check on his or her rights. While the Plaintiff may know and, it may be true, that most policies include such step-down coverage limits,[4] the applicable standard is the objective belief of a reasonably intelligent consumer. The Court finds such a consumer would find the step-down provision unexpected especially because it emasculates apparent coverage found on the declarations page where Plaintiff's cover letter accompanying the Policy expressly directs the insured to look for coverage limits. Given the additional confusion created by the drafting choices discussed above, there is clearly some activity which can reasonably be attributed to the Plaintiff, the insurer, that could have created an objective expectation of $250,000 in liability coverage, without exclusion or limitation, in the mind of a reasonably intelligent consumer. The Court denies the Plaintiff's Motion for Partial Summary Judgment.

2.  Defendants' Dispositive Motion

The Court incorporates the record, discussions, and findings from Plaintiff's dispositive motion, here.

Defendants rely on *In State Farm Mutual Auto Ins. Co. v. Bogart*, 717 P.2d 449 (Ariz. 1986) (superseded by statute on other grounds), *Do by Minker v. Farmers Ins. Co. of Arizona*, 828 P.2d 1254 (Ariz. App. 1991), *State Farm Mutual Ins. Co. v. Dimmer,* 773 P.2d 1012 (Ariz. 1988), and *Averett v. Farmers Ins. Co. of Arizona*, 869 P.2d 505 (Ariz. 1994).

---

[4]If true, the Court finds no reason why Plaintiff's agent does not provide information regarding the step-down limit in car insurance policies similarly to the information she provides on home-owner insurance for some of those "very basic exclusions," like termites.

In *Bogart,* the "dickered deal" in the policy declaration page was the purchase of owned and non-owned automobile liability coverage with limits of $100,000/$300,000 for bodily injury claims. The policy's boilerplate provisions reduced coverage to the minimum statutory allowed limit if the insured drove a rented car. The Arizona Supreme Court described the two provisions as creating an ambiguity justifying nonenforcement under the *Darner* rule because the boilerplate clause clearly and "quite significantly" modified the "dickered deal." The court suggested the situation might be unconscionable because reasonably intelligent policyholders would be shocked to discover that the substantial protection which they had just purchased was reduced to $15,000, the minimum statutory coverage limit, whenever they drove a rented car. Importantly, the court concluded that such an exclusion should be clearly called to the attention of the insured. *Bogart,* 717 P.2d at 457.

In *Dimmer*, the Arizona Supreme Court considered a situation where the insured believed the liability coverage of the policy had limits of $50,000/$100,000 but the insurer claimed a coverage limit of $15,000 under a step-down household exclusion. Relying on *Bogart*, the Court found the exclusion unenforceable "because of its technical wording and inconspicuous location within the policy boilerplate, and because it gut[ted] the coverage ostensibly granted by the declarations page." *Dimmer*, 773 P.2d at 1021.

In *Do by Minker,* an Arizona appellate court provides guidance and instruction on the subject in question. *See Tucker*, 71 F.Supp.3d at 987 (relying on *Burns,* 929 F.2d at 1424, directing federal courts ruling in diversity cases be informed by non-precedential state appellate court decisions). The appellate court in *Do by Minker,* followed *Dimmer* finding that under the doctrine of reasonable expectations, "an insurer must provide coverage up to the policy limits per person stated in an automobile liability policy, even when the injured person making the claim is a resident of the household of the insured and notwithstanding a household exclusion in the policy, where not doing so violates the reasonable expectation of the insured that family members are fully covered." *Do by Minker*, 828 P.2d at 1256.

In *Do by Minker* the question was whether the trial court had a proper factual basis to decide on summary judgment that enforcement of the household exclusion violated the reasonable expectations doctrine. Importantly, the record reflected Do's deposition testimony that when he purchased the policy, he showed the agent a summary of coverage for $50,000 per person and $100,000 per accident. Do also told the agent that he was buying the policy for his family and that his main purpose was to make sure that, if anything happened, the family was covered. *Id.* at 1258. Do avowed that he specifically asked how much he would recover if his family were hurt and was told that recovery was $50,000/$100,000. *Id.* at 1257.

Here, the Defendants' attestations do not reflect that they specifically said to Plaintiff's agent that they wanted "family coverage." While this was the most important factor in *Do by Minker,* there is no suggestion that as a matter of law there are any determinative magic words an insured must use to secure liability coverage for family members. The record in this case reflects attestations by both Defendants that they wanted liability coverage for their family, including each other. (D MSJ, SOF, Ex. B: K. Gee Decl. ¶¶ 8-9 (Doc. 29-6) at 2-3; Ex. C: S. Gee Decl. ¶¶ 14-15, 18 (Doc. 29-7) at 3.) Defendants had no other resident family members besides each other, and the agent knew this. She also knew the Defendants drove to work and worked together at the restaurant they owned. While Plaintiff's agent attests that she did not know they drove together, Defendants dispute her testimony on this point. It is, however, undisputed, the Defendants told Plaintiff's agent they wanted individual liability coverage in the amount of $250,000, she offered such a quote, and Plaintiff tendered such coverage pursuant to the declaration page, which Defendants accepted. The Court finds that this evinces an expectation by Defendants to obtain what they requested and what Plaintiff tendered: the $250,000/$500,000 liability coverage limits reflected in the declaration page, without exclusion or limit. *Cf., Spain*, 731 P.2d at 89 (in respect to UM coverage, intent to purchase a specified coverage limit shown by either ordering that amount or by accepting it when tendered). Like Do, Defendants attestations reflect that when they purchased the Policy, they expected the coverage

reflected on the declaration page protected their family—in Do's case his children and here, each other.

Like the agent in *Do by Minker*, the Plaintiff's agent never said anything about limits or exclusions to the coverage listed on the declarations page, specifically the agent did not inform the insured regarding the step-down household exclusion for resident-family members. "Do testified that he was not aware of the household exclusion and that if he had been aware of such an exclusion, he would not have bought the policy." *Id.* at 1258. Defendants attest the same. (D MSJ, SOF, Ex. B: K. Gee Decl. ¶¶ 8-9 (Doc. 29-6) at 2-3; Ex. C: S. Gee Decl. ¶ 12 (Doc. 29-7) at 3.) "Do also testified that the agent did not show him the actual policy at the time of purchase or ask him to read it, although he did receive it by mail sometime later." *Id.* The same situation occurred here; the Defendants did not and could not read the Policy because it was written in English. "Nothing on the declarations page of the [Do] policy mention[ed] an exception or exclusion." *Id.* Again, this is true, here.

Finally, as in *Do by Minker,* the insurance agent's testimony does not contradict the insured's assertions of fact related to the communications that transpired between them. *Id.* As explained in the section above addressing Plaintiff's dispositive motion, the Court does not need to resolve the dispute between the parties related to Defendants' proficiency or lack thereof in English. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.")

The Court agrees with *Do by Minker* that under a fair reading of *Bogart,* boilerplate terms that eviscerate the coverage on the policy declarations page "'must be called to the insured's attention, because it is improbable that a buyer will read or understand all the fine print after purchase.'" *Id.* at 1258 (quoting *Bogart,* 717 P.2d at 457). For the reasons stated in the section addressing the Plaintiff's dispositive motion, the Court has found such improbability in this case. Like *Dimmer,* this case "fits squarely into the situation delineated in *Gordinier*: '... [T]he insured did not receive full and adequate notice of the

term in question, and the provision ... emasculates apparent coverage.'" *Id.* (quoting *Gordinier,* 742 P.2d at 284 (citations omitted)). *See also Averett,* 869 P.2d at 534 (Arizona Supreme Court holding that a reduction in coverage found in a step-down of liability coverage "must be intended and agreed to, not merely imposed upon an unwitting customer.")

Here, the Court takes direction from *Falness,* where the automobile insurer sought declaratory judgment that a named insured exclusion barred liability coverage for injury to the insured passenger who was the spouse of the negligent driver. The appellate court certified the question to the Arizona Supreme Court: whether the reasonable expectations doctrine applies to the named insured exclusion. The Arizona Supreme Court held that the named exclusion was not facially invalid but that the doctrine of reasonable expectations applies to the insured exclusion. *Falness,* 39 F.3d at 967. Subsequently, the Ninth Circuit Court of Appeals, like the court in *Do by Minker,* relied on *Dimmer.* The relevant distinction between *Do by Minker* and *Falness* is that the insured parties in *Falness* were killed in the accident. Unlike *Do by Minker,* in *Falness* the court could not look at insured's representations to the insurance agent.

In *Falness,* the court used a "format and clarity" analysis and affirmed the trial court's conclusion that the applicable exclusion, found on page six of a fifteen-page printed policy, included policy language that "'might communicate clearly to a person trained in the law or the insurance business' that the amount of coverage was limited to the statutory amount." *Id.* at 967-68 (citing *Dimmer,* 773 P.2d at 1020). "However, the court in *Dimmer* did not rely on the factual claims of Mr. Dimmer; rather, it examined the form and clarity of the policy based on what a reasonable person purchasing the policy would understand and expect." *Id.* at 968. Under *Dimmer,* the reasonable expectations doctrine applies even in the absence of proof of promises or misrepresentations by an insurance agent. *Id.* (citing *Dimmer,* 773 P.2d at 1017, 1020). In *Dimmer,* the court did not rely on the factual claims of Mr. Dimmer, but instead considered whether there was any unusual extrinsic fact about the insured that the insurer could not reasonably have been expected to know. Following

*Dimmer,* the appellate court found the policy exclusion in *Falness* unenforceable because of its technical wording and inconspicuous location within the policy boilerplate, and because it gutted the coverage ostensibly granted by the declarations page. *Id.* at 967-68 (citing *Dimmers,*773 P.2d at 1021).

In this case, the Court has found similar obfuscation of the exclusion in Defendants' Policy. The Court finds that in this situation, the insured Defendants may seek to invalidate a seemingly non-ambiguous binding agreement pursuant to the doctrine of reasonable expectations. The Court considers the Policy in its entirety and finds that the boilerplate step-down coverage limit would not be understood by the reasonably intelligent consumer who might check on his or her policy rights. Additionally, a reasonably intelligent consumer would find the step-down coverage limit unexpected in light of the directives to look to the limits reflected on the declaration page and, also because it emasculates and eviscerates the bargained for coverage limits reflected on the declaration page. The Court bases these conclusions on the Plaintiff's activity which includes drafting the Policy and attendant documents which failed to direct Defendants' attention to the resident family exclusion and because Plaintiff's agent also failed to explain the step-down coverage limitation. Accordingly, some activity reasonably attributable to the insurer induced Defendants to reasonably believe that they had full liability coverage for a passenger spouse under the Policy for bodily injury, without limitation.

The Court finds the Defendants' subjective expectation that their liability coverage was as reflected on the declaration page of the Policy, $250,000, without limitation, was objectively reasonable. The Defendants had more than a "fervent hope" of coverage and, therefore, need only show the Plaintiff insurer had reason to believe that the insured would not have assented to limited coverage under the boilerplate step-down provision. *See Grabowski*, 150 P.3d at 279 (citing *Darner*, 682 P.2d at 395.)

The Court finds that circumstantial evidence exists from which by inference it concludes that the Plaintiff had reason to know that Defendants would not have assented to the limited coverage under the boilerplate step-down provision.  Applying the factors

suggested in *Grabowski,* 150 P.3d at 279-80, relying on *Darner*, 682 P.2d at 397, that evidence is as follows:

First, the circumstances of the Policy transaction reflect the terms for liability coverage in the amount of $250,000 was negotiated by the parties. The step-down boilerplate limitation was not. While Plaintiff presented evidence that the step-down provision was common and not a bizarre addition to the Policy, the challenged exclusion was unexpected and oppressive because it eviscerated the bargained for coverage. For any resident family member, especially a spouse, the boilerplate step-down coverage of $25,000 eliminated the dominant purpose of the transaction, which was to provide $250,000 in bodily injury coverage for the primary occupants of Defendants' cars-- each other.

The insured did not keep the Plaintiff in the dark regarding their coverage expectation. Plaintiff, knowing that boilerplate terms are often not read or understood by customers or even their own agents, kept the insured in the dark regarding the exclusion that eviscerated the bargained for $250,000 in liability coverage. There were ample and easy opportunities for the insurer to make the exclusion clear. Instead, as described in the section addressing Plaintiff's dispositive motion, Plaintiff bypassed every opportunity to direct attention to the exclusion. Further, Plaintiff drafted the Policy so that even if Defendants had read the boilerplate parts of the Policy, they likely would not have understood their liability coverage for resident family members was limited to $25,000 rather than $250,000. The inference that Plaintiff had reason to believe that the insured would not have assented to limited coverage under the boilerplate step-down provision is reinforced in this case because in some part due to Plaintiff's activities, the Defendants did not have an opportunity to read the boilerplate provision as a term of coverage prior to accepting it.

E.    Conclusion

The Court finds Plaintiff's Motion for Partial Summary Judgment fails under the reasonable expectation doctrine. Defendants are granted summary judgment and shall prepare a form of judgment accordingly.

**Accordingly,**

**IT IS ORDERED** that the Plaintiff's Motion for Partial Summary Judgment (Doc. 30) is DENIED.

**IT IS FUTHER ORDERED** that the Defendants' Motion for Summary Judgment (Doc. 28) is GRANTED.

**IT IS FURTHER ORDERED** that the Plaintiff shall pay $250,000 to Defendants under the liability provision of the Policy.

**IT IS FURTHER ORDERED** that within 14 days of the filing date of this Order, the Defendants shall file a form of Judgment.

Dated this 31st day of August, 2024.

Honorable Cindy K. Jorgenson
United States District Judge